IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BRITTANY ALLISON,

     Plaintiff,

vs.                                        Civ. No. 18-401 KG/SCY

THE CITY OF FARMINGTON,
FARMINGTON POLICE DEPARTMENT,
STEVEN HEBBE, in his individual capacity, AND
BRIAN JOHNSTON, in his individual capacity,

     Defendants.

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendants' Motion for Summary Judgment as to All FLSA and FMLA Counts of Plaintiff's Complaint (Motion for Summary Judgment), filed March 4, 2019. (Doc. 49). Plaintiff filed a response on August 19, 2019, and Defendants filed a reply on September 3, 2019. (Docs. 74 and 77). Having considered the Motion for Summary Judgment and the accompanying briefs, the Court grants the Motion for Summary Judgment.

As an initial matter, Plaintiff moves to strike the "Introduction" section of the Motion for Summary Judgment. Plaintiff asserts (1) neither the Local Rules nor the Federal Rules of Civil Procedure allow an "Introduction" in a motion for summary judgment and (2) the rules require a summary judgment movant to set forth numbered statements of material facts with citations to the record. D.N.M. LR-Civ. 56.1(b); Fed. R. Civ. P. 56(c)(1). Aside from the "Introduction," Defendants, in fact, have numbered "Undisputed Material Facts" with citations to the record.[1] In accordance with the rules on motions for summary judgment, the Court does not rely on

---

[1] Ironically, Plaintiff failed to letter her additional facts in violation of Local Rule 56.1(b).

narrative introductions to decide motions for summary judgment.  Hence, the Court considers only Defendant's "Undisputed Material Facts" to decide the Motion for Summary Judgment, and so the Court declines to strike the "Introduction."[2]

*I.  Background*

    *A.  Plaintiff's Complaint (Doc. 1)*

Plaintiff is a former police officer with the Farmington Police Department (FPD).  She brings this employment lawsuit against the FPD, the City of Farmington, FPD Chief of Police Steven Hebbe (in his individual capacity), and her direct supervisor, FPD Corporal Brian Johnston (in his individual capacity).  Plaintiff's claims arise from alleged issues she had beginning in January 2017 related to her ability to express breast milk while employed by the FPD.

The Motion for Summary Judgment pertains to Counts II and VI, retaliation claims based on the Fair Labor Standards Act (FLSA) and the Family Medical Leave Act (FMLA), respectively.  The retaliation claims are the only remaining claims in this lawsuit.  *See* (Docs. 69, 73, and 76).

In Count II, Plaintiff alleges that she engaged in FLSA protected activity by asking Johnston to accommodate her need to express breast milk.  (Doc. 1) at ¶ 64.  Subsequent to making that request, Plaintiff claims she was subjected to the following adverse employment actions:  "work place hostility" by Johnston, unjustified discipline, physical pain, a negative performance evaluation, and threats by Hebbe regarding "her continued employment and future promotability."  *Id.* at ¶ 65. Plaintiff also alleges that she was "required to express milk through

---

[2] The Court notes that it similarly ruled on Plaintiff's objection to Defendants' "Introduction" in another motion for summary judgment.  *See* (Doc. 75).

open and intentional violations of her federal rights." *Id.* Plaintiff brings Count II against all Defendants.

With respect to Count VI, Plaintiff alleges that she engaged in protected FMLA activity when she took FMLA maternity leave from September 2016 to November 2016. *Id.* at ¶ 110. Approximately five weeks after she returned to work from FMLA maternity leave, Plaintiff alleges that the FPD and Johnston subjected her to an adverse employment action by not accommodating her desire to express breast milk at work, a violation of Plaintiff's federal and state rights. *Id.* at ¶ 111. It appears Plaintiff brings Count VI against Johnston and Hebbe only. *Id.* at ¶ 117.

   *B. Factual Summary[3]*

In November 2016, Plaintiff returned from FMLA maternity leave to work in her FPD patrol position during the swing shift. *Id* at ¶ 14. Plaintiff's supervisor on the swing shift, Tamara Smith, told Plaintiff that she would help Plaintiff get breaks to express breast milk. (Doc. 49-1) at 4, depo. at 54. The practice on the swing shift was that if an officer "could find time between calls to get a lunch break or any type of break," then the officer could take a break. *Id.* at 5, depo. at 59. The officers would call out for a break before getting to their break destination so dispatch would not send officers on calls as they drove to their break destinations. (Doc. 74-1) at 5, depo. at 73.

---

[3] Unless otherwise noted, this factual summary contains uncontested material facts viewed in the light most favorable to Plaintiff.

On January 8, 2017, Plaintiff moved to the day shift to begin her six-month bid with Johnston as her supervisor.[4]  (Doc. 49-1) at 7, depo. at 66.  Unlike Smith, Johnston directed officers to drive to break destinations and then call out that they were on a break.  *Id.* at 8, depo. at 77.  Johnston observed that it is a "common courtesy" to call dispatch when taking a break, but often officers take breaks without calling dispatch.  (Doc. 63-1) at 3, depo. at 45.  Johnston also did not designate when officers should take lunch breaks.  (Doc. 49-1) at 23, depo. at 30-31.

Plaintiff initially did not tell Johnston that she was expressing breast milk because of his directive that officers arrange for their own breaks.  *Id.* at 9, depo. at 78.  Plaintiff, however, would sometimes not have any breaks due to her inability to reach a break destination so she could call out for a break.  *Id.* at 9, depo. at 80.  That situation occurred 10 to 30 times over the course of the six-month bid under Johnston.  (Doc. 74-1) at 10, depo. at 91. Plaintiff noticed that her milk supply began to decrease at the beginning of February 2017 because of the lack of breaks.[5]  *Id.* at 10, depo. at 92.

Consequently, in the beginning of February 2017, Plaintiff told Johnston that she was expressing breast milk and that she could rarely arrange for breaks on her own to express breast milk while at work.  (Doc. 49-1) at 9, depo. at 79; (Doc. 63-1) at 2, depo. at 35.  Johnston did not know that Smith had allowed Plaintiff to take breaks to express breast milk.  (Doc. 74-7) at 2, depo. at 29.  During that conversation, Plaintiff indicated that she needed at least one, if not two, breaks per shift to express breast milk.  (Doc. 74-1) at 8, depo. at 84.  To accomplish that goal,

---

[4] FPD officers work six month assignments or "bids:"  January to June, then July to December. *See* (Doc. 49-1) at 10-11, depo. at 125 and 165.

[5] On February 21, 2017, the physician caring for Plaintiff's baby had concerns about the baby's weight.  (Doc. 74-1) at 15, depo. at 142.

Plaintiff wanted to communicate to Johnston when she needed a break so he could help her take a break. [6]  *Id.* at 8, depo. at 85.  Plaintiff, however, never asked Johnston if she could communicate to him when she needed a break. [7]  *Id.*  Plaintiff also never asked Johnston about providing a dedicated location for expressing breast milk.  (Doc. 49-1) at 20.  Johnston told Plaintiff in that February 2017 conversation that she needed to get help from her co-workers to arrange breaks.  (Doc. 74-1) at 8, depo. at 83.

Plaintiff believes that sometime after her conversation with Johnston, Johnston prevented her from going on a break by cancelling another officer's call and sending Plaintiff to respond to that call instead.  (Doc. 74-1) at 9, depo. at 86.  Plaintiff does not recall if she went on a break after responding to the call.  *Id.* at 9, depo. at 87.

Until March 2017, only Johnston supervised Plaintiff.  *Id.* at 13, depo. at 115.  In March 2017, Sergeant Brandon Lane became a supervisor in Plaintiff's chain of command.  *Id.*  As soon as Lane became Plaintiff's sergeant, Plaintiff spoke with him on March 21, 2017, about getting breaks to express breast milk.  *Id.* at 12-13, depo. 110, 112, and 115.  Lane told Plaintiff she had the right to take breaks to express breast milk.  *Id.* at 12, depo. at 112.  He also told Plaintiff that, if Johnston had any questions, Johnston could talk to him.  *Id.*

_____

[6] Plaintiff testified at her deposition that she did not want Johnston to change how he scheduled lunch breaks.  (Doc. 74-1) at 10, depo. at 85.  Johnston maintains, on the other hand, that Plaintiff requested that he change his lunch policy to designate lunch hours.  (Doc. 49-1) at 23, depo. at 30.  According to Johnston, Plaintiff wanted the lunch schedule changed because "she preferred knowing when she was going to eat and … she was utilizing that time to breastfeed." *Id.* at 23, depo. at 31.

[7] Johnston testified at his deposition that he told Plaintiff to eat whenever she wanted to and if she needed cover to call him.  (Doc. 49-1) at 23, depo. at 31.  Johnston testified that Plaintiff never asked him to cover for her.  *Id.* at 23, depo. at 32.

On April 17, 2017, Johnston contacted Lieutenant Casey Malone about Plaintiff's work performance.  (Doc. 74-3) at 1.  Later that day, Malone met with both Johnston and Plaintiff, noting that he sensed Plaintiff was uncomfortable in Johnston's presence.  *Id.*  Malone, therefore, asked Johnston to step out of the room.  *Id.*  Plaintiff opened up to Malone, stating she was unable to express breast milk at work often enough, which caused issues with her baby and her milk to dwindle.  *Id.*  Plaintiff told Malone that Johnston asked her to express breast milk at lunch but was unable to do so because of the call load.[8]  *Id.*  Moreover, because Plaintiff moved outside of the city limits, Plaintiff no longer could go home to express breast milk and had to use the women's locker room and the "ICC sub station."  *Id.*  Plaintiff did not feel comfortable expressing breast milk at those locations because people walked in.  *Id.*  Malone told Plaintiff that whenever she needed to express breast milk, she could do so.  *Id.*

After speaking with Johnston about Plaintiff's situation, Malone spoke with Hebbe and they came up with a better place for Plaintiff to express breast milk.  *Id.* Hebbe stated that, if necessary, Plaintiff could be temporarily reassigned to a "light-duty schedule."  *Id.*

The next day, April 18, 2017, Malone again met with Plaintiff.  *Id.* at 2.  He told Plaintiff she could use a vacant office with a couch and other furniture, and locks, to express breast milk.  *Id.*  Malone also offered the option of a four- to six-week temporary reassignment.  *Id.*  On April 21, 2017, Plaintiff contacted Malone and advised him that she wanted to be temporarily assigned to a modified duty status for about a week and possibly longer.  *Id.*  Plaintiff indicated that the modified duty status assignment might help her regain her milk supply.  *Id.*  Plaintiff began the temporary assignment, an administrative position, on April 24, 2017.  *Id.*

---

[8] Johnston later informed Malone he only told Plaintiff to try to express breast milk earlier in the day because of the afternoon call load.  (Doc. 74-3) at 1.

Although Johnston did not supervise Plaintiff while she worked in the administrative position, Johnston caused Plaintiff stress by "blatantly ignor[ing]" her when she spoke, glaring at her during briefings, and giving her "dirty looks." (Doc. 49-1) at 11, depo. at 164; (Doc. 74-1) at 16-17, depo. at 149-50. Plaintiff also could not increase her milk supply while working in the administrative position. (Doc. 49-1) at 10, depo. at 124. Consequently, Plaintiff went back into the field in May 2017 to work the day shift and Johnston resumed supervising Plaintiff. *Id.* at 10-11, depo. at 124-25, 164. Two weeks after returning to the field, Plaintiff stopped trying to express breast milk. *Id.* at 10, depo. at 125.

On June 4, 2017, Johnston verbally coached Plaintiff but did not discipline her. *Id.* at 30 and at 24, depo. at 65. Johnston decided to verbally coach Plaintiff "just so it's documented for the next supervisor." *Id.* at 24, depo. at 65. Johnston documented the coaching in a Notice of Corrective/Disciplinary Action in which he stated that Plaintiff was "late with reports," showed up "late" to work, and did not sign "her PowerDMS documents," violations of the FPD's Code of Conduct. *Id.* at 30. When Johnston verbally coached Plaintiff, he told Plaintiff that if she wanted a promotion, she "needed to leave his office smiling because supervisors were watching for the way [she] reacted to being written up and how [she] handled this situation." *Id.* at 28.

At the end of June 2017, Plaintiff spoke to Hebbe about her problems with Johnston, including how Johnston gave her "dirty looks and glares." *Id.* at 28 and at 34, depo. at 73; (Doc. 56-1) at 17, depo. at 168. Hebbe advised Plaintiff "that 'negative things' can happen in a career and that the important thing is to not hold on to it as negative." (Doc. 49-1) at 28. Hebbe told Plaintiff "to turn this negative into a positive by assisting with writing a policy in reference to breast pumping/nursing so that this would not happen to anyone else in the future." *Id.* Hebbe further told Plaintiff "that holding onto a negative can make [her] un-promotable like a few

7

others on [her] current shift." *Id.* Hebbe also told Plaintiff that he was aware of her issues with expressing breast milk and that he played a role in allowing Plaintiff to work in an administrative position in April 2017. *Id.* at 34, depo. at 73. Additionally, Hebbe stated that Johnston's behavior "was all a misunderstanding," although Hebbe had not spoken to Johnston about his behavior. (Doc. 56-1) at 17, depo. at 168-69. Plaintiff perceived Hebbe's tone of voice as "berating." *Id.* at 17, depo. at 167. After that conversation with Hebbe, Hebbe acted coldly toward Plaintiff and would ignore Plaintiff when she walked past him. *Id.* at 17, depo. at 169. From the end of June 2017 to June 2018, Hebbe acted this way with Plaintiff a couple of dozen times. (Doc. 74-1) at 21, depo. at 170.

Lane completed Plaintiff's Performance Evaluation Report (PER) for the January 2017 to July 2017 bid. (Doc. 74-2). Lane noted in the PER that Plaintiff was the subject of a disciplinary action during that time period. *Id.* at 1. Lane explained in the narrative section of the PER that Plaintiff "was verbally coached twice by her shift corporal and had one counseling from the shift sergeant for tardiness…." *Id.* at 3. Lane further noted that Plaintiff's work attendance was "unsatisfactory" while her administrative responsibilities, report writing, and vehicle operation and equipment care "needs improvement." *Id.* at 2. Nonetheless, Lane gave Plaintiff an "excellent" rating for handling citizens and "above average" ratings for personal appearance and co-worker relations. *Id.* Otherwise, Lane reported an "average" rating for the other categories listed in the PER. *Id.* Lane gave Plaintiff an overall rating of "average." *Id.* at 4.

Plaintiff's previous PER, for the July 2016 to January 2017 bid, had "needs improvement" ratings in two categories but no "excellent" ratings. (Doc. 74-5) at 2. Plaintiff received "above average" ratings in four categories. *Id.* As before, the overall rating was

8

"average." *Id.* at 4.  Plaintiff's PER for the January 2016 to July 2016 bid did not include any

"unsatisfactory" or "needs improvement" ratings nor did it include an "excellent" rating.  (Doc.

74-4) at 2.  Plaintiff, however, rated "above average" in three categories.  *Id.*  The overall rating

was "average" as well.  *Id.* at 5.

Plaintiff resigned from the FPD on June 1, 2018.  (Doc. 49-1) at 14.  Plaintiff indicated in

her letter of resignation that she resigned "TO SEEK EMPLOYMENT ELSEWHERE."  *Id.*

With respect to damages, Plaintiff did not lose any wages as a result of the alleged

retaliation.  (Doc. 49-1) at 12, depo. at 171.  Plaintiff claims she lost the ability to work overtime

due to retaliation but she, in fact, worked some overtime after she came back from her FMLA

leave.  *Id.* at 12, depo. at 171-73.  Plaintiff also claims that the inability to express milk caused

both engorgement and a clogged duct which made it painful for Plaintiff to wear her bullet proof

vest.  *Id.* at 28-29; (Doc. 74-1) at 18, depo. at 160.

*II.  The Motion for Summary Judgment*

Defendants move for summary judgment on Count II, the FLSA retaliation claim, and

Count VI, the FMLA retaliation claim.  As an initial matter, Defendants contend that Defendant

Farmington Police Department is not a suable entity and, thus, not a proper defendant.  Next,

Defendants argue that Plaintiff has not presented evidence of a *prima facie* case of retaliation.

Specifically, Defendants argue that Plaintiff has not demonstrated that (1) she suffered from a

materially adverse action, and (2) a causal connection exists between Plaintiff's protected

activity under the FLSA and the FMLA and any alleged materially adverse action.  Plaintiff

opposes the Motion for Summary Judgment in its entirety.

### III.  Standard of Review

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.  *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).  A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor.  *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

### IV.  Discussion

#### A.  Whether Plaintiff can Sue Defendant Farmington Police Department Under the FLSA and the FMLA

Defendants cite well-established Tenth Circuit case law holding that a city police department is not a separate suable entity under 42 U.S.C. § 1983.  *See Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985) (holding that "City of Denver Police Department is not a separate suable entity" under Section 1983).  Only a "person" acting under color of state law can be liable under Section 1983.

Unlike Section 1983's application to a "person" acting under color of law, FMLA retaliation claims apply to "employers."  29 U.S.C. § 2615(a)(2).  Under the FLSA, a retaliation claim applies to "any person," but some courts have interpreted "any person" to mean an employer only.  *See Leo v. Sarasota Cty. Sch. Bd.,* 2019 WL 2453440, at *9 (M.D. Fla.) (noting

that Fourth and Sixth Circuits have held that FLSA retaliation claims apply to employers only while observing Eleventh Circuit stated FLSA retaliation claims apply to employers in determining whether to award punitive damages for FLSA retaliation); *see also Betts v. Work Zone Traffic Control, Inc.*, 2020 WL 582577, at *3 (10th Cir.) (explaining FLSA retaliation elements by referencing employer actions).

Both the FMLA and the FLSA define "employer" to include a "public agency."  29 U.S.C. § 2611(4)(A)(iii) (FLSA definition of employer); 29 U.S.C. § 203(d) (FMLA definition of employer).  The FMLA and the FLSA define a "public agency" as "any agency of … a political subdivision of a State…."  29 U.S.C. § 203(x).

In New Mexico, "[a] municipality 'is an auxiliary of the state government.'" *City of Albuquerque v. New Mexico Pub. Regulation Comm'n*, 2003-NMSC-028, ¶ 3, 134 N.M. 472 (citation omitted); *see also City of Santa Fe v. Armijo,* 1981–NMSC–102, ¶ 3, 96 N.M. 663, (stating that "[m]unicipalities have only those powers expressly delegated by state statute").  It follows then that if the City of Farmington is an "auxiliary of the state government," then the City of Farmington must be "a political subdivision" of the state of New Mexico.  Consequently, the FPD, an agency of the City of Farmington, is an agency of "a political subdivision of a State."  As such, the FPD qualifies as a "public agency" and "employer" for FMLA and FLSA purposes.

Furthermore, even if the FLSA retaliation provision does not explicitly apply to employers, the FLSA defines a "person" as "any organized group of persons." 29 U.S.C. § 203(a).  The FPD is an "organized group of persons," which makes it a "person" under the FLSA retaliation provision.  For the above reasons, the Court concludes that the FPD qualifies both as

11

an "employer" and a "person." Therefore, Plaintiff can sue the FPD for retaliation under the

FLMA and the FLSA, and the FPD is a proper Defendant with respect to Counts II and VI.

      *B. FLSA and FMLA Retaliation*

      The Court applies the *McDonnell Douglas* burden-shifting analysis to retaliation claims

brought under both the FLSA and the FMLA. *See Betts*, 2020 WL 582577, at *3 (noting

application of *McDonnell Douglas* burden-shifting analysis to FLSA retaliation claim); *Mendiola*

*v. Exide Techs.*, 791 Fed. Appx. 739, 742 (10th Cir. 2019) (noting application of *McDonnell*

*Douglas* burden-shifting analysis to FMLA retaliation claim). "Under this analysis, the plaintiff

bears the initial burden of establishing a prima facie case of retaliation, by proving that (1) she

engaged in a protected activity; (2) the defendant took an action that a reasonable employee

would have found materially adverse; and (3) there exists a causal connection between the

protected activity and the adverse action." *Mendiola*, 791 Fed. Appx. at 742 (quoting *Dewitt v.*

*Sw. Bell Tel. Co.*, 845 F.3d 1299, 1318 (10th Cir. 2017) (internal quotation marks and alterations

omitted)). If the plaintiff establishes a *prima facie* case of retaliation, "then the burden shifts to

the defendant to 'offer a legitimate, non-retaliatory reason for the employment action. The

plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is

pretextual.'" *Id.* (quoting *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170

(10th Cir. 2006) (citation omitted)).

      *1. First Prong of Prima Facie Case of Retaliation: Engaging in Activity*
        *Protected by the FLSA and the FMLA*

      Defendants do not dispute that Plaintiff engaged in protected activity under the FLSA

when she spoke to FPD supervisors about taking breaks to express breast milk. (Doc. 49) at 16.

Defendants also do not dispute that Plaintiff engaged in protected activity under the FMLA when

she took FMLA maternity leave.  *Id.*  Plaintiff, therefore, meets the first prong of her *prima facie* case of retaliation.

>    2.  *Second Prong of Prima Facie Case of Retaliation:  Materially Adverse Actions*

To meet the second prong of a *prima facie* case of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations and internal quotation marks omitted).  Under this standard, the adverse action must first be *material* in order to separate significant harms "from trivial harms."  *Id.*  In other words, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Id.* "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not" deter a victim of discrimination from complaining to an employer or even to the Court. *Id.*

Second, the standard for determining a materially adverse action refers to the "reactions of a *reasonable* employee," an objective standard that "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."  *Id.* at 68-69.  Third, the standard "speaks in general terms rather than specific prohibited acts," because an act may be material in some situations but immaterial in other situations.  *Id.* at 69.

Plaintiff argues that the following actions constitute materially adverse actions:  (1) Johnston's June 4, 2017, write-up of his verbal coaching of Plaintiff; (2) Plaintiff's PER for the January 2017 to July 2017 bid; (3) Johnston's refusal to provide Plaintiff with breaks which led

13

to physical pain and loss of breast milk; and (4) Johnston and Hebbe's hostile and harassing behavior.

### a.  Johnston's June 4, 2017, Write-Up

Plaintiff argues first that Johnston's June 4, 2017, write-up of his verbal coaching constitutes a materially adverse action.  However, "[a] write-up alone, without any indication that it was accompanied by a reduction in pay, benefits, responsibilities, or some other adverse effect, is insufficient to establish an adverse employment action."  *Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1367 (M.D. Fla. 2016) (citations omitted).  A write-up, "without more, would be insufficient to 'dissuade[ ] a reasonable worker from making or supporting a charge' against an employer."  *Id.* (citations omitted).

Here, Plaintiff does not dispute the basis for Johnston's write-up, i.e., that she violated the FPD Code of Conduct by being late on reports, arriving to work late, and not signing PowerDMS documents.  In addition, Plaintiff has not presented any evidence that the write-up resulted in a pay reduction, reduction in benefits, or a demotion, or some other adverse effect by subsequent supervisors who may have seen the write-up.  A reasonable jury viewing the evidence in the light most favorable to Plaintiff could not find that Johnston's June 4, 2017, write up would dissuade a reasonable worker from complaining about FLSA and FMLA violations.  Specifically, the write up was based on undisputed violations of the FPD's Code of Conduct and resulted in no adverse effect, thus it does not constitute a materially adverse action.  The write-up, therefore, does not constitute a materially adverse action.

### b.  Plaintiff's PER for the January 2017 to July 2017 bid

Second, Plaintiff argues that her PER for the January 2017 to July 2017 bid constitutes a materially adverse action because it was more negative than her two previous PERs.  "Standing

alone, a poor performance rating does not constitute an adverse employment action because it has no tangible effect on the employee's conditions of employment." *Wilson v. Miller*, 821 F.3d 963, 968 (8th Cir. 2016).  A poor performance rating "is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Id.* (citation omitted).  Furthermore, "a rating unchanged from a prior period" can constitute a materially adverse action if an employee's "volume and quality of work demonstrably improved" from the prior period or the employee overcame "significant difficulties at work in the prior period…." *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015).

In this case, Plaintiff provides no evidence that the PER for the January 2017 to July 2017 bid resulted in a detrimental alteration of her terms or conditions of employment. Moreover, although all three PERs note an overall "average" rating, Plaintiff does not demonstrate that the PER for the January 2017 to July 2017 bid did not somehow reflect her actual job performance.  In fact, Plaintiff received her first "excellent" rating in the PER for the January 2017 to July 2017 bid.  Again, Plaintiff does not dispute that during her January 2017 to July 2017 bid she was late on reports, arrived to work late, and did not sign PowerDMS documents.  Lane considered those undisputed problems in the PER for the January 2017 to July 2017 bid by giving Plaintiff a "needs improvement" rating on report writing, work attendance, and administrative responsibilities.  The PER for the January 2017 to July 2017 bid also mentions that Plaintiff was the subject of a disciplinary action, but the narrative section of the PER explains that Plaintiff was only verbally coached and, thus, not actually disciplined.  (Doc. 74-2) at 3.

The the PER for the January 2017 to July 2017 bid did not adversely affect Plaintiff's employment and is supported by undisputed facts.  Therefore, a reasonable jury viewing the PER

for the January 2017 to July 2017 bid in the light most favorable to Plaintiff could not find that

the PER would dissuade a reasonable worker from complaining about FLSA and FMLA

violations.  Thus, the PER for the January 2017 to July 2017 bid does not constitute a materially

adverse action.

<em>c.  Johnston's Break Policy</em>

Third, Plaintiff argues that Johnston's refusal to provide Plaintiff with breaks, which led

to physical pain and loss of breast milk, constitutes a materially adverse action.  Plaintiff

includes in this argument that Johnston placed the onus on Plaintiff to get her own breaks.  It is

undisputed that Johnston did not refuse to provide Plaintiff with breaks.  Rather, the undisputed

facts show that Johnston did not provide Plaintiff with a designated lunch break.  The undisputed

facts also show that Johnson required Plaintiff to call out for a break when she arrived at her

break destination, a requirement Johnston did not necessarily expect officers to comply with.

Even so, Johnson directed Plaintiff to coordinate breaks with her co-workers.  Unfortunately for

Plaintiff, Johnston's break policy did not result in enough breaks for Plaintiff to continue to

express breast milk regularly, which, in turn, resulted in Plaintiff suffering from pain and

eventually losing her milk supply.

While a reasonable jury could find that this situation constitutes a *material* adversity to

Plaintiff, a reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could

not find that the break situation would dissuade a *reasonable* worker from complaining about

FLSA and FMLA violations.  In fact, Plaintiff complained about the break situation to Lane in

March 2017 and to Malone in April 2017, which led to Malone and Hebbe accommodating

Plaintiff's needs by reassigning her to an administrative position.  Plaintiff has not demonstrated

that Johnston's break policy constitutes a materially adverse action for retaliation purposes.

16

### d. *Johnston and Hebbes's Hostile and Harassing Behavior*

Finally, Plaintiff argues that Johnston and Hebbe's hostile and harassing behavior constitute materially adverse actions.  In particular, Plaintiff asserts the following actions by Johnston created a hostile work environment:  he told her she should "smile" if she wanted a promotion; he wrote her up; ignored her; glared at her; and he gave her "dirty looks."  With respect to Hebbe, Plaintiff asserts that he created a hostile work environment by berating Plaintiff, threatening Plaintiff's promotability, and ignoring Plaintiff.

 As noted above, "snubbing by supervisors," "petty slights," and "simple lack of good manners" normally constitute "trivial harms," and not *material* adversity which would deter a reasonable employee from reporting discrimination.  *Burlington N. Santa Fe Ry. Co.*, 548 U.S. at 68 (citations omitted).  Such behavior, however, can amount to a materially adverse action if it becomes a "pervasively hostile work environment."  *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1217 (10th Cir. 2008).  "An employer creates a hostile work environment when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 851 (10th Cir. 2007) (citation omitted)).  The "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998.  In considering "whether an environment is sufficiently hostile or abusive [courts must] 'look[ ] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

17

whether it unreasonably interferes with an employee's work performance.'" *Id.* at 787–88 (citation omitted).

To begin with, Plaintiff has not presented evidence that Hebbe and Johnston's actions, including Johnston's June 4, 2017, write-up, interfered with Plaintiff's work performance or changed the terms and conditions of her employment. *See Saville v. Int'l Bus. Machines Corp.*, 188 Fed. Appx. 667, 670 (10th Cir. 2006) (citation omitted) (agreeing that "criticism in performance reviews and institution of performance improvement plans, alone, do not constitute objectively intolerable conditions"). For instance, Plaintiff's "employment status" did not change and her "job, pay and benefits all remained the same." *Lujan v. Johanns*, 181 Fed. Appx. 735, 738 (10th Cir. 2006). Also, "[t]here is no evidence the actions complained of affected the likelihood that the [P]laintiff would be terminated, undermined [her] position, or affected [her] future employment opportunities." *Id.* Indeed, Plaintiff continued to work at the FPD for almost another year after the bid at issue ended in July 2017 before resigning to "SEEK EMPLOYMENT ELSEWERE." (Doc. 49-1) at 14.

Moreover, Johnston's comment to Plaintiff that if she wanted a promotion she needed to "smile" after he wrote her up was an isolated comment made at the beginning of June 2017. While Hebbe told Plaintiff at the end of June 2017 to "not hold onto negative things" because doing so could affect her promotability, he also encouraged Plaintiff to help write a breast pumping/nursing policy for the FPD, even if he used what Plaintiff subjectively perceived was a berating tone of voice. Although Hebbe concluded at the same time that Johnston's cold treatment of Plaintiff "was all a misunderstanding" without speaking to Johnston, Hebbe told Plaintiff that he helped to assign her to the administrative position for easier access to breaks. As with Johnston's June 2017 comments, Hebbe's June 2017 comments were isolated.

18

Additionally, a reasonable jury viewing the isolated comments by Johnston and Hebbe in the light most favorable to Plaintiff could not find those comments objectively offensive or threatening.  Instead, an objective observer would conclude that Johnston and Hebbe were advising Plaintiff on how to present herself to enhance her chances for promotion and that Hebbe was trying to ease the tension between Plaintiff and Johnston by stating it "was all a misunderstanding."  Furthermore, a reasonable jury could not find that the unspecified times Johnston ignored Plaintiff, glared at Plaintiff, and gave Plaintiff "dirty looks," and the two dozen times Hebbe acted coldly toward Plaintiff from the end of June 2017 to June 2018, constitute anything other than "petty slights" and "lack of good manners."

Even viewing the totality of the above circumstances in the light most favorable to Plaintiff, i.e., the lack of change in employment status; the isolated comments; and the "petty slights" and "lack of good manners," a reasonable jury could not find that a reasonable person would perceive the actions by Johnston and Hebbe as a pervasively hostile or abusive work environment.  In other words, Plaintiff's evidence "portrays … simply a work environment that exhibits the monitoring and job stress typical of life in the real world, … not a hostile or abusive work environment."  *Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998).  Consequently, a reasonable jury could not find that the actions by Johnston and Hebbe would dissuade a reasonable worker from complaining about FLSA and FMLA violations.  Thus, those actions do not constitute materially adverse actions.

In sum, Plaintiff has failed to come forward with evidence that she meets the second prong of a *prima facie* case of retaliation.  For that reason, Defendants are entitled to summary judgment on the FLSA and the FMLA retaliation claims.[9]

IT IS ORDERD that

1.  Plaintiff's request to strike the "Introduction" section of Defendants' Motion for Summary Judgment as to All FLSA and FMLA Counts of Plaintiff's Complaint (Doc. 49) is denied;

 2. Defendants' Motion for Summary Judgment as to All FLSA and FMLA Counts of Plaintiff's Complaint (Doc. 49) is granted;

3.  summary judgment will be granted in Defendants' favor on Counts II and VI of the Complaint; and

4.  Counts II and VI will be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

---

[9] In light of that determination, the Court need not address Defendants' remaining summary judgment arguments.